Jani K. Rachelson (JK 0121)
Peter D. DeChiara (PD 0719)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036-6976
Tel: (212) 563-4100
Fax: (212) 695-5436
jrachelson@cwsny.com
pdechiara@cwsny.com

Attorneys for Plaintiffs Curtis Nesbit, Lisa Pomper and Jeffrey Stock

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                                                                 :
CURTIS NESBIT, LISA POMPER AND                                   :
JEFFREY STOCK,                                                   :
                                                                 :
                          *Plaintiffs*,                  :    Case No. 10-cv-06388
                                                                 :    (DAB)(KNF)
        - v. -                                              :
                                                                 :
BRIEFLY STATED, INC. and BRIEFLY STATED                          :
INC. PROFIT SHARING PLAN,                                        :
                                                                 :
                          *Defendants.*                  :
-----------------------------------------------------------------X

## NOTICE OF PLAINTIFFS' SUMMARY JUDGMENT MOTION

       PLEASE TAKE NOTICE that Plaintiffs in the above-captioned action hereby move the Court pursuant to Federal Rule of Civil Procedure 56(a) for summary judgment in their favor and an order: (a) requiring Defendants to pay them the difference between the amount of their distributions and the balances in their accounts at the time of the distributions, plus interest and/or earnings; (b) awarding them their attorneys' fees and costs and (c) granting them such other and further relief as is just and proper.

       Annexed hereto is Plaintiffs' Statement of Material Facts.

Dated:  April 8, 2011

                                              /s/ Peter D. DeChiara  
                                              Jani K. Rachelson (JK 0121)  
                                              Peter D. DeChiara (PD 0719)  
                                              COHEN, WEISS AND SIMON LLP  
                                              330 West 42nd Street  
                                              New York, New York 10036-6976  
                                              Tel:  (212) 563-4100  
                                              Fax:  (212) 695-5436  
                                              jrachelson@cwsny.com  
                                              pdechiara@cwsny.com  

                                              Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of (1) the foregoing Plaintiffs' Notice of Summary Judgment Motion with annexed Statement of Material Facts; (2) Plaintiffs' Memorandum of Law in Support of Their Summary Judgment Motion and (3) the Declaration of Peter D. DeChiara, to be served this 8th day of April 2011, by ECF, upon:

> John J. Hay
> Susan Shanklin
> SALANS LLP
> 620 Fifth Avenue
> New York, New York 10020
> jhay@salans.com
> sshanklin@salans.com
>
> Attorneys for Defendants Briefly Stated, Inc.
> and Briefly Stated, Inc. Profit Sharing Plan

/s/ Peter D. DeChiara
Peter D. DeChiara

Jani K. Rachelson (JK 0121)
Peter D. DeChiara (PD 0719)
COHEN, WEISS AND SIMON LLP
330 West 42nd Street
New York, New York 10036-6976
Tel: (212) 563-4100
Fax: (212) 695-5436
jrachelson@cwsny.com
pdechiara@cwsny.com

Attorneys for Plaintiffs Curtis Nesbit, Lisa Pomper and Jeffrey Stock

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
:
CURTIS NESBIT, LISA POMPER AND : 
JEFFREY STOCK, :
:
:  Case No. 10-cv-06388
*Plaintiffs*, : (DAB)(KNF)
:
- v. - :
:
BRIEFLY STATED, INC. and BRIEFLY STATED :
INC. PROFIT SHARING PLAN, :
:
*Defendants.* :
-----------------------------------------------------------------X

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

Pursuant to Rule 56.1(a) of the Local Civil Rules of this Court, Plaintiffs in the above-captioned action submit this statement of material facts as to which they contend there is no genuine issue to be tried:

1. LF purchased BS in September 2005.[1] *See* Ex. 2 at ¶6.[2]

2. Under the purchase agreement, LF paid part of the purchase price initially;

---

[1] The abbreviations used herein are the same as those in Plaintiffs' memorandum of law.

[2] Citations to "Ex." are to the exhibits attached to the April 8, 2011 declaration of Peter D. DeChiara, filed herewith.

receipt of the balance of the purchase price by Egna, who was then BS's owner and president, *see* Exs. 1, 2 at ¶2; Ex. 3, Tab A, at 28, was made contingent on BS achieving certain pretax profits over a three-year "earn out" period following the purchase. *See* Exs. 1, 2 at ¶7; Ex. 3, Tab A, at 32, 34; Ex. 4 at D362 (§§2.2, 2.4).

3. The purchase agreement further provided that Egna, who was to continue as BS's president, would receive an annual bonus the size of which would depend on the pretax profits that BS earned. *See* Exs. 1, 2 at ¶8; Ex. 3, Tab A, at 30-32; Ex. 4 at D413 (§5(b)).

4. At the time of the acquisition, BS maintained an ESOP. Ex. 4 at D6 (§1.01).

5. As part of the acquisition, LF purchased all of the BS shares that were then in the ESOP, putting about $22.6 million into the ESOP. Exs. 1, 2 at ¶9; Ex. 3, Tab A, at 17; Ex. 4 at D119.

6. Section 6.8(b) of the purchase agreement provided that during the three-year "earn out" period, LF "shall continue to maintain, and shall not terminate" the ESOP. Ex. 4 at D386.

7. Although the purchase agreement required LF to maintain and not terminate the ESOP, it did not require that contributions be made to it. *See* Exs. 1, 2 at ¶15; Ex. 3, Tab A at 36-37.

8. According to Beckerman, the parties decided to keep the ESOP in place out of a concern that without it, "some employees may leave." Ex. 3, Tab A at 99.

9. BS was profitable when LF acquired it and LF wanted to avoid any disruptions during the "earn out" period. Ex. 3, Tab A at 34-35.

10. LF wanted to avoid the loss of key employees. *See* Ex. 3, Tab A at 35-36.

11. At the time of the acquisition, Egna expressed his concern that he "not lose his key people." Ex. 3, Tab A at 98; *see* Exs. 1, 2 at ¶13.

12. Egna did not want to lose key employees in part out of his concern about earning the contingent payments during the "earn out" period. Ex. 3, Tab A, at 99.

13. Effective January 1, 2006, the ESOP converted into the Plan. *See* Exs. 1, 2 at ¶16; Ex. 4 at D6-D7; Ex. 3, Tab A at 51.

14. As of January 1, 2006, the Plan was closed to new participants. *See* Exs. 1, 2 at ¶17; Ex. 4 at D15 (§4.01(b)); Ex. 3, Tab A at 53.

15. The Plan provides that the BOD has sole authority to decide whether an employer contribution -- referred to as a "Profit Sharing Contribution" -- will be made to the Plan for a given year. *See* Ex. 4 at D17 (§6.01(b)); Ex. 3, Tab A at 55; Ex. 18 at 13-14; Exs. 1, 2 at ¶18.

16. Section 6.02 of the Plan states in part that: "Profit Sharing Contributions, if any, shall be paid by the Company in cash to the Trust Fund …" Ex. 4 at D17.

17. Section 8.02 of the Plan states in part that: "All contributions made on behalf of a Participant shall be paid to the Trustee …." Ex. 4 at D19 (emphasis added).

18. The Plan has no language on the subject of complete discontinuance of contributions.

19. The deadline under the Plan for making a contribution is September 15 of the year following the year for which the contribution is made. Ex. 4 at D17 (§6.02); Ex. 3, Tab A at 58; Exs. 1, 2 at ¶21.

20. After September 2005, the BOD met twice a year, keeping minutes of its meetings. *See* Exs. 1, 2 at ¶22; Ex. 3, Tab A at 9-14; Ex. 18 at 11-12.

21. Defendants have "no minutes of Board of Directors meetings reflecting discussions about contributions to the [Plan]." Exs. 1, 2 at ¶23.

22. BS has made no additional cash employer contributions to the Plan since 2005. *See* Exs. 1, 2 at ¶24; Ex. 3, Tab A at 18-19; Ex. 16, at Resp. #2.

23. There are no minutes of meetings of the BOD nor resolutions of the BOD indicating that new money will be added to the Plan in the future.

24. The Plan's Form 5500 reports to the IRS for 2006, 2007, 2008 and 2009 are blank on the line for employer contribution. *See* Ex. 4 at D192; D200; D207; Ex. 14 at 6.

25. BS earned pretax profits of $18.4, $17.9, $14.6 and $9.1 million in 2006, 2007, 2008 and 2009, respectively, on gross sales of $107, $103, $117 and $126 million, respectively. *See* Ex. 3, Tab A, at 69-71.

26. BS continued to be profitable in 2010. Ex. 3, Tab. A at 35.

27. The Plan requires that a participant complete seven years of service to vest fully in his or her account. Ex. 4 at D22 (§10.01(b)).

28. If a participant terminates employment before fully vesting, the non-vested portion of his or her account is treated as a forfeiture. Ex. 4 at D22 (§10.02(a)).

29. In February 2007, the Committee decided to allocate, for 2006, a certain amount in the Plan's forfeiture account to the accounts of Plan participants. Ex. 4 at D111-D113.

30. As of February 2007, there had been no determination by the BOD that there would be a contribution to the Plan for 2006. Ex. 16, at Resp. #3.

31. In his valuation report for the Plan for 2006, which issued in February 2007, Weinstock, the Plan's actuary, referenced the forfeiture allocation but nonetheless

concluded that "[t]here was no contribution made" to the Plan for 2006. Ex. 4 at D466; Exs. 1, 2 at ¶34.

32. Weinstock, an actuary with 25-30 years experience, including with profit-sharing plans, *see* Ex. 3, Tab B, at 5, explained that in reporting that there had been no contribution for 2006, he "was referring to what is typically defined as a contribution, which is an injection of new money contributed to the plan by the employer." Ex. 3, Tab B, at 6.

33. Prior to the *Lavin* litigation, neither the Company nor the Plan ever took issue with the conclusion set forth in the 2006 valuation report.

34. The Plan's Form 5500 report filed with the IRS for 2006 nowhere indicates that there had been a contribution for 2006. *See* Ex. 4 at D192 (no entry for line 2a(1)).

35. The valuation report for the Plan for 2005 considered forfeiture allocations and employer contributions separately. *Compare* Ex. 4 at D670 (line 3(b)) (forfeiture allocation) *with* D669 (line 2) (employer contribution); *see also* Ex. 3, Tab B at 21-24.

36. Prior to the *Lavin* litigation, neither the Company nor the Plan ever took issue with the methodology that Weinstock used in the 2005 valuation report.

37. Since making the forfeiture allocation for 2006, the Plan has made no further forfeiture allocations. Ex. 3, Tab A at 78.

38. The amount in the Plan's forfeiture account has since grown to over $3.3 million. Ex. 3, Tab A at 100.

39. Egna tried to dissuade BS employee Farrisha Mohammed from resigning by telling her that it would be crazy for her to quit because employees who stayed with the Company would share in the forfeiture money. Ex. 6 at ¶6.

40. After LF's acquisition of BS, BS employees who were Plan participants

also became participants in LF's 401(k) Plan ("LF Plan").  Exs. 1, 2 at ¶40; Ex. 3, Tab A at 47; Ex. 4 at D124.

        41.    The LF Plan includes employees of six other companies that LF acquired. Ex. 4 at D218.

        42.    The 401(k) plans of these six other LF subsidiaries were merged into the LF Plan, *see* Ex. 4 at D218 n.1, leaving BS employees as the only employees of an LF subsidiary who participate in their own company's plan as well as in LF's Plan.  *See* Exs. 1, 2 at ¶43; Ex. 3, Tab A, at 49-50; Ex. 4 at D218.

        43.    Like all the other eligible participants in the LF Plan, eligible BS employees receive an employer "match" contribution to their LF Plan accounts.  *See* Exs. 1, 2 at ¶41; Ex. 3, Tab A at 50.

        44.    On December 20, 2006, Weinstock, the Plan's actuary, told Graham Schell, an executive in LF's human resources department, *see* Ex. 3, Tab A, at 44, that if Weinstock did the "coverage tests" under IRC §410(b), 26 U.S.C. §410(b), the Plan would "likely fail" and "have to include other participants" in the Plan.  Ex. 4 at D133; Ex. 3, Tab B at 6-8.

        45.    Schell responded that "this raises a huge red flag for me."  Ex. 4 at D133.

        46.    Schell added: "Dave [Weinstock] is very concerned as this will continue to be an issue for 2007, 2008 and forward."  *Id*.

        47.    LF, as BS's parent, was part of BS's "controlled group." Exs. 1, 2 at ¶47; Ex. 5, at A at 5; Ex. 3, Tab A, at 19

        48.    Weinstock testified that if the Plan failed the coverage testing, the remedy would be "to bring in additional people" to the Plan.  Ex. 3, Tab B at 11.

49. Weinstock testified that if the Plan failed the coverage testing, there might have been other remedies, such as taking the highly compensated employees out of the Plan, but that he had no recollection of explaining such alternative remedies to Schell.  Ex. 3, Tab A at 15

50. At the time that Weinstock advised Schell in December 2006, he believed the Plan would likely fail the coverage tests because LF had so many more employees than BS. *See* Exs. 1, 2 at ¶48; Ex. 3, Tab B at 10.

51. In 2007 and 2008, the LF Plan had 1,281 and 1,305 participants, respectively, Ex. 3, Tab A at 26-27, while the BS Plan had 52 and 46, respectively.  *See* Ex. 4 at D197, 204.

52. Weinstock did not perform coverage testing for 2006 that took into account LF employees because, as he later learned, a statutory one-year transition period for newly acquired companies excused consideration of LF employees for that year.  *See* Exs. 1, 2 at ¶50; Ex. 3, Tab B at 9.

53. Had there been contributions to the Plan in 2007 or thereafter, the §410(b) testing would have required consideration of the LF employees.  *See* Exs. 1, 2 at ¶51; Ex. 5 at Ex. A at 6.

54. In March 2007, Lavin, who left BS in 2005, received a distribution of 40% of the amount in his Plan account.  *See* Exs. 1, 2 at ¶¶1, 52; Ex. 4 at D83; Ex. 6 at ¶7.

55. In May 2007, Lavin submitted a claim letter to the Plan asserting that he was entitled to the balance in his account "as a result of the Company's decision to discontinue making contributions to the Plan following the Company's acquisition by" LF in 2005.  Ex. 4 at D74.

56. Lavin asserted in his claim letter that the "complete discontinuance of

7

contributions" began after 2005, following LF's acquisition of BS.  *See* Ex. 4 at D74, D77.

57. The Committee, which included Egna and Beckerman, denied Lavin's claim, stating in its November 19, 2007 denial letter that there had been no "complete discontinuance of contributions" within the meaning of IRC §411(d)(3)(B).  Ex. 4 at D86, D88; Ex. 3, Tab A at 79-80.

58. Beckerman testified that in making its decision to deny Lavin's claim, the Committee did not discuss any other provisions of the Plan other than §10.04(a).  *See* Ex. 3, Tab A at 86.

59. In denying Lavin's claim, the Committee did not consider Weinstock's 2006 valuation report finding that there were no contributions for 2006.  Ex. 3, Tab A, at 93-94; Ex. 4 at D466.

60. Lavin appealed the Committee's denial of his claim, Ex. 4 at D90-94, and the Committee denied the appeal.  Ex. 4 at D95-105.

61. Egna and Beckerman were the only Committee members present at the March 20, 2008 meeting where Lavin's appeal was denied.  *See* Ex. 4 at D114.

62. At the March 20, 2008 meeting, Egna referred to "the Plan's mechanism of recharacterizing forfeitures as profit sharing contributions."  Ex. 4 at D115.

63. There was no discussion at the March 20, 2008 meeting of any Plan provision other than §10.04(a).  Ex. 3, Tab A at 90.

64. There was no reference at the March 20, 2008 meeting to Weinstock's 2006 valuation report finding no contribution for 2006.  Ex. 3, Tab A at 93-94; Ex. 4 at D466.

65. At the March 20, 2008 meeting, the Committee also resolved that "the 2007 allocation must be suspended pending the resolution of Lavin and the related claims."  Ex.

4 at D115.

66. Beckerman testified that because only the BOD can determine whether contributions will be made, the Committee's March 20, 2008 resolution was a "proposed decision." Ex. 18 at 46.

67. The minutes of the March 20, 2008 meeting make no reference to any decision that the addition of new money to the Plan would be suspended.

68. As of March 2008, the BOD had not made any decision that contributions would be suspended.

69. Having exhausted the Plan's internal appeals procedure, Lavin sued on October 8, 2009.

70. Defendants took the position in the *Lavin* litigation that Lavin's time to sue had expired months before he filed suit.  *See* Ex. 20, at 15.

71. Plaintiffs are former BS employees who, after their employment ended, received less than all the amounts that were in their Plan accounts.  Exs. 8, 9 at ¶¶8, 11, 14, 24-26; Ex. 18 at 38.

72. In October 2009, Plaintiffs submitted a claim to the Plan.  Ex. 10 at 2.

73. Plaintiffs asked Defendants to excuse them from exhausting the Plan's internal claims procedure, so that they could join Lavin's suit.  *See* Ex. 1, 2 at ¶73.

74. Defendants refused this request.  *See id.*

75. In April 2010, the Committee denied Plaintiffs' claim.  Ex. 11 at 1, 11.

76. The Committee in its denial letter described Plaintiffs as having asserted a claim arising "as a result of 'complete discontinuance of contributions' under Section 411(d)(3) of the Internal Revenue Code." Ex. 11 at 5.

77. The Committee denied Plaintiffs' claim based on its determination that "[a] Complete Discontinuance of Contributions Did Not Occur," *id*. 7, a determination that it reached based on the statute, *see id.* 6, regulations interpreting the statute, *see id*. 6-7, and Internal Revenue Manual guidance on the statute, *see id*. 7.

78. In an August 18, 2010 letter, the Committee denied Plaintiffs' appeal. Ex. 13.

79. The Committee's August 18, 2010 letter asserted that the BOD "ratified" the Committee's decision regarding the 2006 forfeiture allocation, Ex. 13 at 10 n.21, referencing a June 21, 2010 BOD resolution, *see id*. at 2.

80. The August 18, 2010 letter cited a June 21, 2010 resolution as part of the "documentary record" on which the Committee relied. *See* Ex. 13 at 2.

81. At the time of the Committee's August 18, 2010 denial letter, there was no June 21, 2010 BOD resolution, only an unsigned, "for discussion purposes" draft. Ex. 17, at 48-49; Ex. 18, at 21-22.

82. Not until February 10, 2011 did the BOD execute the resolution. *See* Ex. 17, at 34-35.

83. In its August 18, 2010 denial letter, the Committee asserted that the Company had not made contributions because it had "temporarily suspended" them pending resolution of Lavin's and Plaintiffs' claims. Ex.13 at 5.

April 8, 2011

                                         /s/ Peter D. DeChiara  
                                         Jani K. Rachelson (JK 0121)  
                                         Peter D. DeChiara (PD 0719)  
                                         COHEN, WEISS AND SIMON LLP  
                                         330 West 42nd Street  
                                         New York, New York 10036-6976  
                                         Tel:  (212) 563-4100  
                                         Fax:  (212) 695-5436  
                                         jrachelson@cwsny.com  
                                         pdechiara@cwsny.com  
                                         Attorneys for Plaintiff John E. Lavin